UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

S.E.,

    Plaintiff

    v.

PAMELA BONDI, et al.,

    Defendants.

Civil Action No. 25-1108 (JDB)

**ORDER**

    S.E. is a nineteen-year-old woman from Iran. Compl. [ECF No. 4] ¶¶ 6, 43. She "fled Iran in fear of persecution for her beliefs that women should not be required to comply with Islamic law, and for exercising those beliefs contrary to the regime's policies." Id. ¶ 43. After making her way to Mexico, she crossed the United States' southern border on February 21, 2025. Id. ¶¶ 6, 44.

    S.E.'s timing was unfortunate. Almost exactly a month prior, on his first day in office, President Trump had issued Proclamation 10888. See 90 Fed. Reg. 8333 (Jan. 20, 2025). Invoking a statutory provision permitting the President to "suspend the entry of all aliens or any class of aliens" in certain circumstances, see 8 U.S.C. § 1182(f), the Proclamation announced the existence of an "invasion into the United States across the southern border" and "suspend[ed] the physical entry" of immigrants crossing the border. 90 Fed. Reg. at 8335. But the Proclamation didn't impose only entry restrictions. It also prohibited immigrants who had "engaged in the invasion across the southern border"—that is, who had crossed the southern border on or after January 20, 2025, and are now in the United States—"from invoking provisions of the [Immigration and Nationality Act] that would permit their continued presence in the United States." Id. As relevant here, the suspended provisions include those guaranteeing "[a]ny alien who is physically present

1

in the United States or who arrives in the United States" the right to "apply for asylum." See 8 U.S.C. § 1158(a)(1); Refugee and Immigr. Ctr. for Educ. & Legal Servs. v. Noem, Civ. A. No. 25-306 (RDM), 2025 WL 823987, at *1 (D.D.C. Feb. 22, 2025).

So when S.E. "requested an asylum hearing" after arriving in the United States, "[s]he was informed that, due to the Proclamation, no asylum hearings would be granted to anyone." Compl. ¶¶ 46–47; see also id. ¶ 54 ("Plaintiff repeatedly requested an asylum interview, which she was repeatedly by the Defendants and their agents denied due to the Proclamation."). Instead, the government sought to deport her. On April 8, 2025, she received a notice that she would be removed, and on April 11 she "was informed by an [Immigration and Customs Enforcement] agent she would be removed from the United States that same day and sent back to Iran without having an asylum interview and without an opportunity to have her claims for protection judicially reviewed." Id. ¶¶ 50–51.

S.E. filed this lawsuit and sought an emergency stay the same day, asking the Court to forbid the defendants from deporting S.E. See id. ¶ 87; Pl.'s Emergency Mot. to Stay Removal [ECF No. 3] ("Stay Mot.") at 2. The motion explained S.E.'s fear that, "[w]ithout Court intervention," she would be deported that very day "to suffer persecution without having ever received an asylum hearing." Stay Mot. at 2. And she emphasized the "limited relief" she sought: not to be released, nor to be granted asylum, but merely "to stay her removal pending resolution of an impending preliminary injunction motion," which would seek to enforce her right to pursue asylum pursuant to established procedures. Id.

After being held up in motions practice about S.E.'s ability to proceed under a pseudonym, the case was assigned to the undersigned today, April 17, 2025. S.E. apparently remains in the country; according to her counsel, S.E. was told on April 15—two days ago—that she would "be

2

deported in the next several days but did not [receive] an exact date." Status Rep. [ECF No. 6] ¶ 6.

## Analysis

A request for a stay of removal pending judicial review turns on four factors: "(1) whether the stay applicant has made a strong showing that [s]he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 426 (2009). Each factor favors a stay here.

### I.    Likelihood of success.

S.E. is likely to succeed on the merits of her claim that she may not be deported without the opportunity to seek asylum. On this issue, Congress has spoken: "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). And an application for asylum may not be summarily ignored: if an immigrant "indicates either an intention to apply for asylum . . . or a fear of persecution," an immigration officer "shall refer [her] for an interview by an asylum officer." 8 U.S.C. § 1225(b)(1)(A)(ii).

Thus, immigrants "can avoid . . . removal by claiming asylum." Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 109 (2020). If they do, various procedural protections attach. See id. at 109–10. S.E. claimed asylum. Compl. ¶ 46. She is therefore legally entitled to those protections.

At this early stage of the case, and with nearly no briefing on the matter, it appears unlikely that the President has the unilateral power to eliminate those congressionally-mandated procedures with the stroke of a pen. The statutory provision on which the Proclamation appears to rely "vests the President with authority to restrict the entry of aliens" in certain circumstances." Trump v. Hawaii, 585 U.S. 667, 674 (2018) (emphasis added) (discussing 8 U.S.C. § 1182(f)). That authority would not seem to permit the Proclamation's restriction on the ability of immigrants already in the country to invoke congressionally-guaranteed provisions (including asylum applications) "permit[ting] their continued presence in the United States." 90 Fed. Reg. at 8335.

## II.   Irreparable injury.

S.E. avers that personnel at the detention center where she is held have informed her that she will be deported imminently, within the next few days. She fears being returned to Iran, where she "would be in imminent danger of torture and persecution." Compl. ¶ 53. Once sent to Iran, the government may well take the position—as it has in other litigation—that S.E. is irretrievable. See generally App. to Vacate Injunction, Noem v. Abrego Garcia, 25-1345 (U.S. 2025). The Court has little difficulty concluding that this amounts to irreparable harm. See, e.g., Kiakombua v. Wolf, 498 F. Supp. 3d 1, 57 (D.D.C. 2020).

## III.   Balance of the equities and public interest.

The remaining two factors "merge when the Government is the opposing party." Nken, 556 U.S. at 435. For obvious reasons, S.E. has a strong interest in not being summarily returned to Iran. The public, too, has an interest in Congress's judgment about the importance of asylum being abided. See id. at 436. By contrast, the government is not inconvenienced in a cognizable way by a delay in its ability to deport S.E. until it considers her entitlement to asylum in the way Congress has prescribed.

\*\*\*

For the above reasons, it is hereby **ORDERED** that the motion is **GRANTED**; it is further **ORDERED** that the removal of S.E. be **STAYED** pending further order of the Court and Defendants accordingly are **ENJOINED** from removing S.E. pursuant to Proclamation 10888; and it is further **ORDERED** that the Court will hold a hearing in this matter on Monday, April 21, 2025, at 2:00 p.m.

/s/
JOHN D. BATES
United States District Judge

Dated: April 17, 2025